## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| ANJULA AGRAWAL, as next friend of A.N., her minor child, |
| *Plaintiff*, |
| v. |
| THE POTOMAC SCHOOL, |
| *Defendant*. |

Civil Action No. 21-2460 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Anjula Agrawal, as mother and next friend of her minor daughter, A.N., asserts claims against Defendant the Potomac School ("Potomac") for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.  Dkt. 1.  Potomac moves to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim. Dkt. 13 at 6.  For the reasons explained below, the Court will **DENY** Potomac's motion to dismiss for lack of subject-matter jurisdiction and will **GRANT** its motion to dismiss for failure to state a claim.

## I.  BACKGROUND

For purposes of resolving the pending motion to dismiss, the Court accepts the following factual allegations as true.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Agrawal, a resident of the District of Columbia, brings this suit as mother and next friend of her minor daughter, A.N.  Dkt. 1 at 2 (Compl. ¶¶ 1–3).  A.N. attended Georgetown Day School ("GDS"), a private K-12 school in Washington, D.C., from 2015, when she was in the sixth grade, until she graduated in 2021.  *Id.* at 4 (Compl. ¶ 11).  In or around January 2020, A.N.

began receiving "solicitous . . . messages" via Snapchat—a private messaging app—from "John," a student at the Potomac School, a private K-12 school in McLean, Virginia.[1]  *Id.* (Compl. ¶¶ 12–13).  Knowing that "John had a girlfriend," A.N. repeatedly rebuffed his advances.  *Id.* (Compl. ¶ 13).  When John continued to contact her, A.N. forwarded one of the messages to John's girlfriend.  *Id.* (Compl. ¶ 14).  In retaliation for exposing John's activities to his girlfriend, two of John's friends, "Noah" and "Eric"—referred to in the complaint as the "Potomac Boys"—began "a yearlong social media and texting campaign aimed at sexually harassing, cyberbullying, and humiliating A.N."  *Id.* (Compl. ¶ 15).

The complaint describes two instances of harassment that occurred in February 2020. First, on February 13, 2020, Noah sent messages to A.N. that included "sexually suggestive and harassing questions about her body."  *Id.* (Compl. ¶ 17).  Second, on an unspecified date, Eric sent a message to A.N. containing "a suggestive video."  *Id.* (Compl. ¶ 18).  A.N. reported these communications to Amy Killy, a counselor at GDS.  *Id.* (Compl. ¶ 19).  Later, Killy informed A.N. that she had "reported the sexual harassment and cyberbullying to a counselor at the Potomac School, who informed [her] that the students in question would be 'spoken to.'"  *Id.* (Compl. ¶ 20).  Killy also instructed A.N. to "report any subsequent issues to her directly."  *Id.* (Compl. ¶ 21).

The Potomac Boys "continued harassing and cyberbullying A.N. for the remainder of the [2019-20] school year . . . during school hours and while on Potomac [School] property."  *Id.* at 5 (Compl. ¶ 22).  Around that same time, Noah sent a message to A.N. in which he "beg[ed] her to email the Potomac School director of student life to tell them that Noah's harassment was in

---

[1] The complaint refers to "John" and two other individuals using quotation marks, s*ee, e.g.*, Dkt. 1 at 4 (Compl. ¶ 12), indicating that these names are pseudonyms.

fact a 'joke.'" *Id.* (Compl. ¶ 23).  When A.N. "refused this request," the Potomac Boys'

"harassment intensified." *Id.* (Compl. ¶ 24).  During the summer of 2020, the Potomac Boys

"comment[ed] on A.N.'s social media pages that she was a crybaby and a snitch for informing

school officials of their cyberbullying and harassment." *Id.* (Compl. ¶ 25).  A.N. reported those

comments to Killy, who again "reported the conduct to the Potomac School." *Id.* (Compl. ¶ 26).

Despite Killy's reports to Potomac, the Potomac Boys continued to harass A.N. during

the following school year (2020-21). *Id.* (Compl. ¶ 27).  The complaint recounts three incidents

in May 2021 in which the Potomac Boys again taunted A.N. on social media for her "reports of

their cyberbullying and harassment"; made "harassing statements" about A.N. in videos posted

on social media; and posted a photo on Snapchat with a caption that "suggest[ed] that [Noah] and

his friends had or planned to engage in sexual relations with A.N." *Id.* (Compl. ¶¶ 28–30).  A.N.

reported these incidents to Killy. *Id.* (Compl. ¶ 31).  In July 2021, A.N. sought and obtained

temporary anti-stalking orders against the Potomac Boys from the D.C. Superior Court. *Id.* at 6

(Compl. ¶ 32).

A.N. graduated from GDS in 2021 and is now enrolled in college. *Id.* (Compl. ¶ 34).

She alleges that she "has sought mental health treatment in relation to injuries she has sustained

due to the Potomac Boys' harassment and cyberbullying." *Id.* (Compl. ¶ 33).  She also "fears for

her safety and wellbeing" because she now attends the same university as one of the Potomac

Boys. *Id.* (Compl. ¶ 34).

Agrawal filed this suit on September 20, 2021. *Id.* at 24.  She initially named as

defendants Potomac and the Association of Independent Schools of Greater Washington

("AISGW"), a non-profit association of private schools in the Washington, D.C. region that

"controls the policies, procedures[,] and protocols of its 78 member schools," including Potomac.

*Id.* at 2–3 (Compl. ¶¶ 3–5).  Agrawal claimed that Potomac violated Title IX of the Education Amendments Act, 20 U.S.C. §§ 1681–1688 (Count I), and that both Defendants committed (1) negligent supervision and hiring/retention (Counts II and III); (2) negligence (Counts IV and V); (3) intentional infliction of emotional distress (Counts VI and VII); and (4) negligent infliction of emotional distress (Counts VIII and IX).[2]  *See id.* at 6-24 (Compl. ¶¶ 36–112).  On October 28, 2021, Agrawal stipulated to dismissal of her claims against AISGW, Dkt. 12, leaving only the claims against Potomac—Counts I, II, IV, VI, and VIII—intact.

On November 19, 2021, Potomac moved to dismiss the complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  Dkt. 13 at 1.  On December 3, 2021, Agrawal filed a brief in opposition to Potomac's motion to dismiss, in which she "withdr[e]w [her] claim for Negligent Supervision and Hiring/Retention (Count II) only, as it is subsumed elsewhere in [her] Negligence claims."  Dkt. 14 at 7.  Potomac filed its reply brief on December 10, 2021.  Dkt. 15.  On December 17, 2021, Agrawal voluntarily dismissed her Title IX claim (Count I) against Potomac.  Dkt. 17.

That brings the Court to where things now stand.  Agrawal's claims for negligence (Count IV), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VIII) remain pending against Potomac, and Potomac's motion to dismiss, which also remains pending, is ripe for review.

---

[2] The complaint erroneously labels two counts as "Count VII."  *Compare* Dkt. 1 at 19 ("Count VII – Intentional Infliction of Emotional Distress"), *with id.* at 21 ("Count VII – Negligent Infliction of Emotional Distress").  For clarity, the Court will refer to the later count as Count VIII.

## II.  LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction.  A Rule 12(b)(1) motion "may take one of two forms."  *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  First, it "may raise a 'facial' challenge to the Court's jurisdiction."  *Id.*  A facial challenge asks whether the complaint alleges facts sufficient to establish the Court's jurisdiction.  *McCabe v. Barr*, 490 F. Supp. 3d 198, 210 (D.D.C. 2020); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  In this posture, the Court must accept the factual allegations of the complaint as true.  *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (collecting cases).  "Alternatively, a Rule 12(b)(1) motion may pose a 'factual' challenge to the Court's jurisdiction."  *Hale*, 2015 WL 7760161, at *3 (citing *Erby*, 424 F. Supp. 2d at 182–83).  When a motion to dismiss is framed in this manner, the Court "may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (collecting cases).

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), in contrast, "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (citations omitted) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 675, 678 (2009)).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Id.* at 555–56 (citations and quotation marks omitted).

## III.  ANALYSIS

### A.     Subject-Matter Jurisdiction

Although Potomac moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim, it fails to advance any argument relating to the Court's jurisdiction. Nevertheless, because the Court "ha[s] 'an independent obligation to determine whether subject-matter jurisdiction exists,' even when jurisdictional defects are not specifically identified by the parties," *Flaherty v. Ross*, 373 F. Supp. 3d 97, 103 (D.D.C. 2019) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)), and because Agrawal voluntarily dismissed the only claim arising under federal law (the Title IX claim), the Court pauses to consider whether it has jurisdiction.

The complaint pleads federal question jurisdiction and diversity jurisdiction.  Dkt. 1 at 3 (Compl. ¶¶ 6, 8).  As just noted, the Court lacks federal question jurisdiction under 28 U.S.C. § 1331 because Agrawal voluntarily dismissed her only claim arising under federal law.  *See* Dkt. 17.  Determining whether the Court has diversity jurisdiction over Agrawal's remaining claims requires slightly more extended analysis.  At the time she filed suit, Agrawal alleged that she was a citizen of Washington, D.C.; that Potomac's principal place of business was in Virginia; and that AISGW's principal place of business was in Washington, D.C.  *Id.* at 2–3

(Compl. ¶¶ 1–4).  The parties thus lacked "complete diversity" because Agrawal and AISGW were both citizens of Washington, D.C. for jurisdictional purposes.  *See* 28 U.S.C. § 1332.

A plaintiff may, however, cure a jurisdictional defect by dropping a non-diverse party.  *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572 (2004); *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 73 (1996).  That is what Agrawal has done here by voluntarily dismissing her claims against AISGW, the only non-diverse party in the case.  Dkt. 12.  Agrawal alleges that she (and A.N.) and Potomac are diverse, Dkt. 1 at 2 (Compl. ¶¶ 1-3), and that the amount in controversy exceeds $75,000, *id.* at 3 (Compl. ¶ 8).  Potomac, moreover, has not contested either of those allegations, and the Court has no reason to doubt their truth.

The Court, accordingly, has diversity jurisdiction over Agrawal's state law claims against Potomac.[3]

## B.    Failure to State a Claim

Agrawal's remaining claims are for negligence (Count IV), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VIII).  The parties analyze the sufficiency of these claims under D.C. tort law, and the Court does so as well.[4]

---

[3] Because the Court has diversity jurisdiction, it need not decide whether to retain supplemental jurisdiction over Agrawal's state-law claims under 28 U.S.C. § 1367(a), notwithstanding her voluntary dismissal of her federal-law claim.  *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005).

[4] Neither Agrawal nor Potomac addresses choice-of-law, but both parties apply D.C. law in their briefs.  *See generally* Dkt. 13; Dkt. 14; Dkt. 15.  "Because litigants may waive choice-of-law issues, the Court need not challenge their evident assumption that District of Columbia law applies."  *Parker v. John Moriarty & Assocs. of Va.*, 332 F. Supp. 3d 220, 234 n.10 (D.D.C. 2018); *see also C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 255 n.5 (D.D.C.  2007) (citing *CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996)) ("[A] party may waive a choice of law argument."); *In re Korean Air Lines Disaster of Sept. 1, 1983*,

1.    *The Negligence Claims (Counts IV and VIII)*

The Court starts with Agrawal's claims for negligence (Count IV) and negligent infliction of emotional distress ("NIED") (Count VIII).  Although asserted as separate claims, the Court can discern no material difference between them.  Both claims allege, in identical paragraphs, that Potomac's negligent conduct caused A.N. to suffer mental and emotional harm.  Dkt. 1 at 14, 22 (Compl. ¶¶ 74, 105).  Both claims also contain identical paragraphs listing eight ways in which Potomac allegedly breached a duty of care to A.N.  *Compare* Dkt. 1 at 13–14 (Compl. ¶ 71), *with id.* at 21–22 (Compl. ¶ 104).  And although Agrawal's negligence claim contains three paragraphs describing Potomac's duty of care to A.N., which the NIED claim does not repeat, *compare* Dkt. 1 at 13 (Compl. ¶¶ 68–70), *with id.* at 21 (Compl. ¶ 102), the NIED claim "incorporates and realleges all paragraphs of [the] Complaint" and, in summary form, alleges that Potomac "had a duty to . . . A.N. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her," *id.* at 21 (Compl. ¶ 102).  The Court will, accordingly, treat Agrawal's negligence and NIED claims together and will refer to them collectively as the "negligence claims."

Until 2011, a plaintiff could not bring a negligence claim for "emotional distress without accompanying physical injury" under D.C. law unless he could show, at a minimum, that the defendant's conduct placed him "in danger of physical injury" and that he "feared for his own safety."  *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc) (citation and quotation marks omitted).  Those requirements were based, in part, on the D.C. Court of Appeals' concern that "claims for emotional distress resulting from negligent conduct might be

---

932 F.2d 1475, 1495 (D.C. Cir. 1991) ("[C]ourts need not address choice of law questions *sua sponte*.").

nearly limitless if [the court] [relied] on traditional negligence principles . . . to determine the scope of the negligent actor's liability." *Id.* at 797. In *Hedgepeth*, however, the D.C. Court of Appeals recognized another "limited" avenue for recovery, 22 A.3d at 792, which is sometimes referred to as the "special relationship" test, *see, e.g.*, *Lamb v. United States*, No. 21-3000, 2022 WL 2966337, at *8 (D.D.C. July 26, 2022).

> To satisfy the "special relationship" test, a plaintiff must show that
>
> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Hedgepeth*, 22 A.3d at 810–11. The first two elements, which *Hedgepeth* describes as imposing a "self-limiting principle" on the availability of tort remedies for emotional damages, *id.* at 812, are necessary to establish a duty of care. The third element, in turn, considers whether the defendant breached that duty and, by doing so, caused the plaintiff to suffer serious emotional distress.

Potomac moves to dismiss Agrawal's negligence claims on the ground that Potomac did not owe a cognizable duty of care to A.N., even under the more expansive "special relationship" test. *See* Dkt. 13 at 17. As Potomac correctly notes, the D.C. Court of Appeals has held that "[t]he relationship between a student and his school"—that is, his *own* school—"is not enough, without more, to impose the predicate duty of care for a claim of [NIED]." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016). Against that backdrop, Potomac argues that Agrawal has failed to allege facts sufficient to support the existence of "a special relationship between [Potomac] and a non-student," A.N., under the circumstances alleged here. Dkt. 13 at 17.

Agrawal's complaint advances two possible theories of duty.  First, Agrawal alleges that, "[a]s a member of AISGW, and in accordance with the AISGW-mandated policies and guidelines regarding sexual misconduct and bullying," Potomac owed A.N. a duty "to provide an educational environment free [of] sexual misconduct and cyberbullying" and to "investigate and protect against sexual misconduct and cyberbullying perpetrated by its own students."  Dkt. 1 at 13 (Compl. ¶ 68).  Second, she alleges that "[b]y having actual notice of the sexual harassment and cyberbullying [of A.N. by the Potomac Boys], and promising to put a stop to such behavior," Potomac "entered into a relationship with" A.N. that gave rise to a duty of care.  *Id.* (Compl. ¶ 69); *see also* Dkt. 14 at 21–22.  At least as alleged in the current complaint, neither theory withstands scrutiny.  The Court will, accordingly, dismiss Agrawal's negligence claims, but will do so without prejudice.

      a.    <u>Membership in AISGW</u>

Agrawal's complaint falls well short of raising a plausible inference that Potomac owed a duty of care to A.N. based on its membership in AISGW.  Agrawal alleges that, "[a]s a member of AISGW, and in accordance with the AISGW-mandated policies and guidelines regarding sexual misconduct and bullying, [Potomac] owes a duty to provide an educational environment free [of] sexual misconduct and cyberbullying and to investigate and protect against sexual misconduct and cyberbullying perpetrated by its own students."  Dkt. 1 at 13 (Compl. ¶ 68).  Because that allegation constitutes a legal conclusion, the Court may not accept it as true, even at this early stage of the proceeding.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Of course, "legal conclusions can provide the framework of a complaint," so long as they are "supported by factual allegations."  *Id.* at 679.  But Agrawal's complaint is devoid of any

10

factual allegations regarding the nature of Potomac's membership in AISGW or how it created a "relationship with [A.N.] . . . [that was] of a nature that necessarily implicate[d] [A.N.'s] emotional well-being." *See Hedgepeth*, 22 A.3d at 810.  The complaint does not even describe the "AISGW-mandated policies and guidelines regarding sexual misconduct and bullying" that Agrawal invokes as a basis of Potomac's duty of care.  Dkt. 1 at 13 (Compl. ¶ 68).  The Court is simply left to guess what AISGW's policies are, what kinds of obligations those policies impose on Potomac, how those policies were advertised to students attending any of the member schools, and to whom those obligations purportedly extend.  More is required to state a claim in federal court.  *See Iqbal*, 556 U.S. at 678.

Because AISGW was previously a named defendant in this case, the complaint does contain some factual allegations regarding *AISGW*'s conduct towards A.N.  *See, e.g.*, Dkt. 1 at 15–17 (Compl. ¶¶ 76–84).  But those allegations do not elucidate Agrawal's claims against Potomac.  The complaint also briefly describes AISGW in the section of the complaint that is captioned "parties," alleging that AISGW is "an advisory and accreditation entity [that] offers its member schools, including Defendant Potomac, training and resources on issues [such as] sexual misconduct, bullying, and academics" and that "AISGW controls the policies, procedures[,] and protocols of its 78 member schools."  *Id.* at 3 (Compl. ¶ 5).  At most, those allegations describe AISGW's structure and mission in general terms.  They fail, however, to furnish "content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### b.  Promise to Perform

Agrawal's second theory of duty is equally deficient, at least as pled in the current complaint.  As discussed above, a duty of care may arise when a defendant "has undertaken an

obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being." *Hedgepeth*, 22 A.3d at 810–11.  It is not enough, however, for the plaintiff to allege that the defendant expressed a commitment to the plaintiff's well-being in general terms.  *See Cavalier v. Catholic Univ. of Am.*, 513 F. Supp. 3d 30, 63 (D.D.C. 2021) ("*Cavalier II*") (rejecting the notion that "NIED relationships or undertakings should be read at . . . a high level of generality").  Rather, under the limited "special relationship" test, "the duty between the purported tortfeasor and victim" must be "discrete."  *Id.*; *see also Destefano v Child.'s Nat'l Med. Ctr.*, 121 A.3d 59, 69 (D.C. 2015) ("[T]he defendant's undertaking determines the scope of its duty." (citation omitted)).  Thus, to determine whether Potomac owed a duty of care to A.N.—and to determine the nature of that duty—the Court must "focus[] on the 'specific terms'" of Potomac's alleged undertaking.  *Cavalier II*, 513 F. Supp. 3d at 63.

Agrawal alleges that "[b]y having actual notice" of the Potomac Boys' conduct and "promising to put a stop to such behavior," Potomac assumed a duty to "protect . . . A.N. from reasonably foreseeable harm at the hands of its students" and to "act and intercede on A.N.'s behalf."  Dkt. 1 at 13 (Compl. ¶¶ 69–70).  In her brief in opposition to Potomac's motion to dismiss, Agrawal elaborates on that allegation, arguing that Potomac undertook an obligation to A.N. by "investigat[ing] A.N.'s claims" and "tr[ying] to put a stop [to] the Potomac Boys' campaign of sexual harassment and cyberbullying."  Dkt. 14 at 25.

Potomac responds that the factual allegations in Agrawal's complaint are insufficient to support her theory of duty because the complaint merely alleges that "the [GDS] counselor told Plaintiff that the Potomac School would speak to the Potomac students."  Dkt. 15 at 7.  In Potomac's view, the complaint "does not allege with any specificity what was told to [Potomac], when [Potomac] was told[,] . . . who was the recipient of the information," or even "what

12

information about [A.N.], if any, was shared with [Potomac]." *Id.* Finally, Potomac argues that, even if a limited duty did exist, the complaint fails to allege facts sufficient to establish a breach of that duty. Dkt. 13 at 17.

The fundamental problem with Agrawal's argument is that her description of Potomac's duty—that is, that Potomac undertook to "protect [A.N.] from reasonably foreseeable harm" and to "act and intercede" on A.N.'s behalf—is unsupported by any nonconclusory allegations in the complaint. A comparison of Agrawal's brief in opposition to Potomac's motion to dismiss and her complaint brings this flaw into focus. In her brief, for example, she asserts that "[d]espite assuring A.N. via her counselor that the harassing conduct would cease immediately, Potomac failed to take any meaningful steps to address" the harassment. Dkt. 14 at 5. In support of her contention that Potomac "assur[ed] A.N. via her counselor that the harassing conduct would cease," Agrawal cites paragraphs 20, 24, and 26 of her complaint. *Id.* But those paragraphs of her own complaint say no such thing. Paragraph 20 alleges that a counselor at Potomac told A.N.'s counselor that "the students in question would be 'spoken to'"; paragraph 24 alleges that the Potomac Boys intensified their harassment of A.N. after she refused to tell the Potomac counselor that "Noah's harassment was in fact a 'joke'"; and paragraph 26 merely alleges that A.N.'s counselor told the Potomac counselor this. Dkt. 1 at 4–5 (Compl. ¶¶ 20, 24, 26). There is a vast difference, however, between providing an "assur[ance]" that "the harassing conduct would cease," Dkt. 14 at 5, and merely asserting that the offenders "would be 'spoken to,'" Dkt. 1 at 4 (Compl. ¶ 20). And, although the complaint alleges that Potomac received further reports of the Potomac Boys' conduct on at least one later occasion, *see id.* at 5 (Compl. ¶ 26), it contains no nonconclusory, factual allegations even hinting that Potomac committed to investigating or otherwise acting upon those reports.

At one point, the complaint does characterize Potomac's conduct as a "promis[e] to put a stop to [the Potomac Boys'] behavior." *Id.* at 13 (Compl. ¶ 69). But that allegation is a legal conclusion that finds no basis in the factual averments. Notably, the allegation appears only in the portion of the complaint that—after incorporating the preceding factual averments—sets forth Agrawal's negligence cause of action. *Id.* Because that allegation appears as part of Agrawal's recitation of the elements of her negligence claim, and because the complaint lacks any factual averments regarding a "promis[e] to put a stop" to the Potomac Boys' conduct, the Court need not—and will not—assume the truth of that assertion. *See Iqbal*, 556 U.S. at 678.

To the extent Potomac undertook a limited duty of care by committing to speak to the Potomac Boys, moreover, the complaint fails plausibly to allege that Potomac breached that duty. According to the complaint, at some point after the Potomac counselor informed A.N.'s counselor at GDS that the Potomac Boys would be "spoken to," one of the Potomac Boys "messaged A.N. begging her to email the Potomac School director of student life to tell them that [his] harassment was in fact a 'joke.'" Dkt. 1 at 5 (Compl. ¶ 23). The complaint alleges, moreover, that the Potomac Boys continued to harass A.N. "for informing school officials of their cyberbullying and harassment." *Id.* (Compl. ¶ 25); *see also id.* (Compl. ¶¶ 28–30). The most plausible reading of those allegations is that the Potomac counselor did precisely what she said she would do—she spoke to the Potomac Boys about their misconduct. Although Agrawal tells a different story—or at least hints at one—in her opposition brief, all that matters for present purposes is what is contained in the complaint, and the complaint fails to describe any undertaking from Potomac, other than its promise to talk to the Potomac Boys.

The Court will, accordingly, dismiss Agrawal's negligence claims.

2.    *Intentional Infliction of Emotional Distress (Count VI)*

Agrawal's claim for intentional infliction of emotional distress ("IIED") also fails under Rule 12(b)(6).  To state an IIED claim, Agrawal must allege facts sufficient to show "(1) extreme and outrageous conduct on the part of [Potomac] which (2) either intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress."  *See Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009) (second alteration in original) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)).

Potomac contends that Agrawal's IIED claim fails to satisfy the first element because she "has not identified any specific conduct or action taken by the Potomac School" that was "extreme and outrageous."  Dkt. 13 at 18–19.  To plausibly allege "extreme and outrageous conduct" under D.C. law, a plaintiff must allege facts sufficient to show that the defendant committed acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994)).  "This 'very demanding standard' is 'only infrequently met.'"  *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 453 (D.D.C. 2016) (quoting *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997)).  "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."  *Drejza*, 650 A.2d at 1312 (citation omitted).

Agrawal makes three arguments in support of her IIED claim, none of which is persuasive.  First, Agrawal contends that she has "pled numerous failings and abuses of authority by Potomac['s] administration investigating her claims of harassment and bullying."  Dkt. 14 at

23.  Once again, however, there is a striking disconnect between how Agrawal describes her factual averments in her opposition and what she actually pled.  All that Agrawal cites in support of her contention that Potomac abused its authority in its investigation of her claims of harassment are the portions of the complaint that describe the Potomac Boys' conduct, A.N.'s reports to her GDS counselor, and her counselor's reports to Potomac.  *See* Dkt. 1 at 5 (Compl. ¶¶ 19–20, 23, 26–30).  Beyond at least implying that Potomac, in fact, spoke to the offenders, she does not allege any conduct on Potomac's part, let alone any "failings and abuses of authority." To be sure, the fact that the Potomac Boys continued to engage in conduct that A.N.'s GDS counselor reported to Potomac suggests that Potomac's efforts—whatever they may have entailed—were unsuccessful.  But without any allegations about what Potomac did or did not do, the complaint fails to support any plausible inference that Potomac's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *See Homan*, 711 A.2d at 818.

Second, Agrawal argues that "the lewd comments, sexual harassment, solicitations, and cyberbullying A.N. experienced . . . rise to the level necessary for a[n] [IIED] claim."  Dkt. 14 at 23.  That argument incorrectly attributes the Potomac Boys' conduct to the Potomac School. Because Agrawal's claim is against the school, it is the school's conduct that must meet the standard for "extreme and outrageous" behavior.  As discussed, the complaint fails to allege facts to support any plausible inference that the school's behavior met that exceedingly high standard.[5]

---

[5] Agrawal does not cite any authority for the proposition that a school may be held vicariously liable for intentional torts committed by its students, and the Court is unaware of any such authority.  In the negligence context, moreover, courts have consistently declined to hold schools liable for injuries caused to third parties by their students.  *See, e.g.*, *Glyten v. Swalboski*, 246 F.3d 1139, 1143 (8th Cir. 2001) (holding that a school did "not owe a duty to [plaintiff] because it does not have a special relationship with [plaintiff], a non-student, third-party"); *Fenrich v.*

Finally, Agrawal contends that she has "pled enough to show that Potomac maintained and contributed to a pervasively hostile educational environment." Dkt. 14 at 24. In support of her argument, she cites two cases: *Burnett v. American Federation of Government Employees*, 102 F. Supp. 3d 183 (D.D.C. 2015) and *Howard University v. Best*, 484 A.2d 958 (D.C. 1984). But those cases stand for the unremarkable proposition that "[c]reation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of [IIED]." *Best*, 484 A.2d at 986; *Burnett*, 102 F. Supp. 3d at 190–91. Here, in contrast, the complaint contains no factual allegations regarding Potomac's actions in relation to its educational environment or how those actions contributed to A.N.'s injuries. It bears note, moreover, that *Burnett* and *Best* involved employer-employee relationships, which differ materially from Potomac's relationship with A.N., a non-student.

Agrawal cites one case, *Miles v. Washington*, No. CIV-08-166, 2009 WL 259722 (E.D. Okla. Feb. 2, 2009), in which an IIED claim in a school setting survived a motion to dismiss. *Miles* lends some support to the proposition that omissions or nonfeasance on the part of a school can constitute the extreme and outrageous conduct underlying an IIED claim. *Id.* at *6 (denying motion to dismiss IIED claim against college that, among other things, allegedly "fail[ed] to protect" plaintiff). This Court, however, has understood *Miles*'s holding to be limited to the extreme circumstances of that case. As the Court recently emphasized in describing the *Miles* decision,

---

*The Blake Sch.*, 920 N.W.2d 195, 202–03 (Minn. 2018) (holding that a private school did not owe a duty of care to non-students injured by the negligent driving of a student); *Fuzie v. S. Haven Sch. Dist. No. 30*, 553 N.Y.S.2d 961, 963 (Sup. Ct. 1990) (holding that a school district "clearly did not owe [non-student] plaintiff a general duty to protect her from the acts of its student"). The Court, therefore, has reason to doubt that Potomac can be held vicariously liable for intentional torts allegedly committed by its students.

[in *Miles*,] the defendants "discourag[ed] [the] [p]laintiff from reporting the rape;" "fail[ed] to protect her after she reported it;" actively "expressed their disgust and displeasure" with the plaintiff's decision to seek a protective order; and "fail[ed] to punish other students" who threatened to "beat her down," sent text messages saying they "want[ed] to kill" her, and tried to "break . . . down" plaintiff's door while "screaming threats" at her.

*Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 41 n.4 (D.D.C. 2018) (alterations in original) (quoting *Miles*, 2009 WL 259722, at *1, *5). Here, by contrast, the facts alleged do not by any stretch of the imagination "rise to the same level of 'extreme and outrageous conduct' as the facts presented in *Miles*." *Id.*

Because Agrawal fails to allege any conduct on Potomac's part that plausibly supports an IIED claim, the Court will dismiss Count VI for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Potomac's motion to dismiss for lack of subject-matter jurisdiction and will **GRANT** Potomac's motion to dismiss Counts IV, VI, and VIII of the complaint for failure to state a claim. Because those are the only remaining claims in the case, the Court will also **DISMISS** the action.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 15, 2022